Good morning, everyone. We start with the very pleasant duty of an admission. Mr. Rossi, will you approach the bench? And I turn the burden over to Judge Rayner. Thank you, Judge Newman. Well, Steve, I really count on my good fortune that circumstances were such that you joined my chambers as a law clerk. And during the time that you worked with me, I've found you to be diligent, hardworking, a producer of excellent work product. And not only have I found you to be a fine, fine lawyer, but I've also found that you're a legal thinker. And your presence in my chambers has rewarded all of us, in particular myself. So with that, I move for the admission of Stephen A. Rossi, who is a member of the Bar in good standing of the highest court of California. I have knowledge of his credentials and am satisfied that he possesses the necessary qualifications. Thank you, Judge Rayner. As we take the motion under advisement, are there any further comments from the bench? Yes, not only do I not object to the motion that's been made, but in this particular instance, having also had the privilege to work with Steve and to have him work very closely with me and with my chambers, I second the motion wholeheartedly. Steve, it's been a pleasure to have as part of our chamber's family, and we intend to adopt him going forward. I enjoyed the fact that his brain worked much like mine, and especially from the standpoint of having a strong hold on economics and that part of the approach to the law. So I second the motion, and I welcome him to the Bar. Thank you. Are there any further comments, any objections from the audience? In that case, it is my great pleasure to grant the motion. Now, Steve, would you approach the clerk for administration of the office? Thank you, Steve. Welcome to the Bar of this court. Thank you very much. Thank you. The business of the court this morning is the case of Urand v. Impact, No. 2012-1280. Mr. Musgrove. Thank you, Your Honor. Good morning, and may it please the court. My name is Kyle Musgrove. I'm here on Appellant Impact's behalf today. This case is related to an earlier case that this panel saw with regard to Milan's defense of, or at the time it was a finding of invalidity that this court reversed. What happened as part of that was a situation that triggered a settlement contract that Impact had entered as part of that underlying litigation. So what we're here about today doesn't relate any further to the invalidity or non-infringement of those facts. We understand that. Let me ask you, what is it that you're asking to do right now? Are you asking to launch your own ANDA? No, Your Honor. What we're asking to do is we are asking to launch, but the record, what we've talked about in the record, is there are two agreements here. The settlement agreement, and there's also a separate agreement with Urand, who I don't believe is represented at counsel table today. But that's an, that's a transfer price agreement. And in that transfer price agreement, which was signed at the same time. Right. You've agreed to only sell authorized generic. Right. So what we're, exactly. So what we're asking for is the capability, right, to launch that authorized generic and to move out from under the influence. So all you want to sell is the product that you already have on hand? No, Your Honor. This would be both a product we have on hand and going forward. We believe, and plaintiffs have agreed, if 3.2c applies, that was a permanent trigger to our right to sell. But how do you, even if that were the case, even if there were a case that 3.2c applied to, how do you get around the fact that Urand and Anessa are themselves enjoined from authorizing any additional sales? They couldn't transfer anything more to you. Even if your contract told them to, they couldn't under the district court's order. They could not under the district court's order. That's correct, Your Honor. But obviously that order is somewhat in flux because of this court's finding. I believe Mylan's indicated to the district court that they're going to move the petition for certiorari. But the plaintiffs were the ones who asked for that injunction. If the plaintiffs no longer seek the injunction, it would be dissolved. Why would the plaintiffs no longer seek the injunction? The plaintiffs sought the injunction to keep Mylan off the market. And as part of that, plaintiffs agreed to pull themselves back, at that time through Watson. But if plaintiffs, if the settlement agreement gives us the right to go, they have no authority to ask for an injunction against us, which would go against the settlement agreement. That's up to the district court to decide, is it not? The district court, certainly the court could remand to the district court to do that. But under the injunction that's applied to impacts, the right is whether there's a likelihood of success. And under this contract, we don't believe there is a likelihood of success. I question something a little bit more preliminary than that, and that's whether we even have jurisdiction over this case. And I think the question here is whether this appeal has been timely filed. Can you address that? Yes, Your Honor. We believe it has been timely filed. What we're appealing from is the order that was entered in March. And the order in March addressed several things. It was an order to address modification of the injunction. But you're arguing you were not covered by the initial injunction. Your Honor, we certainly do not believe that we were covered by the March injunction. We weren't a party at that time. This court's decision and additives specifically say that a party that's not present before the court, the court doesn't have jurisdiction to enter an injunction against them. But didn't that injunction include everybody that's in active concert with some of the named parties? Your Honor, I think additives addresses that point. There is an issue about whether a person or whether impacts would be a party to that injunction as opposed to whether the activities that they might conduct would have been in contempt of that injunction. But additives makes very clear that that injunction did not apply to impacts. It was not a party at the time. But even if that were the case, 1292 specifically says that you can address modifications or refusals to dissolve the injunction. That was addressed by the district court here, as well as the final decision on the settlement agreement. Yes, but if we look at the November activity concerning the injunction, and that was a mere clarification for the district court to simply clarify the terms, then that takes us back to the initial injunction, doesn't it? Well, if you view it as a clarification, then you have to say that impacts was a party to that earlier injunction. I don't believe this court can do that if it follows the additive case law first. Secondly, regardless of whether or not that injunction is specifically before the court, there was a final judgment here reached with regard to the settlement agreement. The court specifically addressed that. That's also addressed under jurisdiction of external grounds of 1291 and 1295. This was a patent case. The settlement agreement arose out of a patent case, and it's a final order as well. With respect to the injunction, though, I understand that your argument is that it was not a clarification, both because you weren't covered by the original agreement and because you believe there was some change of circumstances in the interim? Well, certainly what we believe happened – we don't believe it was a clarification because it wasn't part of the injunction to begin with. And so the question of clarification relates back to what the injunction said at that time, back in, I believe it was May of 2011. But the issue is we sought modification based on the settlement agreement. In fact, the court did not have in front of it. And if the settlement agreement applies, we have the right to go to market and should not be. But if you were covered by the initial agreement, then you can't seek a modification unless there's some change of circumstance that would justify seeking the modification, correct? I don't believe I agree with that. First off, well, if you assume that we were covered under the initial injunction, then this court may be correct that the jurisdiction with regard to that particular aspect of this case may be at issue, and that would require a revamp to the district court to decide. But this court also has in front of it the construction of the settlement agreement. And that was a final decision. I'm sorry. Is your position that there is a decision that this court can make based on the argument today, which would permit your client to enter the market immediately? We do believe that's the case, Your Honor. We do not believe that the injunction… Despite the validity of the patent? Well, despite the validity of the patent, because this is a contract question. But I think one point on that, because I know a lot's been made of that, and a lot was made about whether impacts participated for the court below. I would point out, and this is in the record at 1244 and 1245, as well as with regard to impacts of notice letter, this court had before it previously the validity question. But those claims, as you may recall, there was one independent claim in each patent suit. They were very specific claims. Those parts of the claims were not at issue with this court. But specifically as relates to impact, the last part of those claims claimed a plasticizer, and claimed not just a plasticizer by function, but claimed a specific marquoise group of plasticizers. We put forward from the very beginning that impacts of ANDA did not infringe. ANCHIN was held not to infringe at the district court level. But you never even got an ANDA. Well, we didn't get the approval of the ANDA. That's correct, Your Honor. But the infringement analysis is still done with regard to the ANDA. And ANCHIN was actually held by the lower court, and the appeal did not come up, not to infringe those two patents for that very reason. But impact was not permitted to even participate in the trial substantively other than as a Me Too because you didn't produce any discovery, right? Well, first off, we would be… We're not going to retry the claims that you settled and chose not to try. Well, first off, we didn't choose not to try. That's, I believe, not reflected in the record. The court had bifurcated the infringement case. So it was not a question of whether or not there was going to be a trial on infringement of impacts of ANDA or not. There was going to be a trial. It did not go forward at the same time. But for impacts, you've already conceded that you're infringing. We have because of the settlement agreement, which brings us back to the settlement agreement, which is the key crux to this case. So let's look at the settlement agreement and talk about the trigger event on there. When I look at the circumstances surrounding Watson and whether it's a… or a classic distributor. And distributor being a company that takes possession of the goods in its own name, keeps inventory, markets under its own name, and keeps the profits of that marketing. Now, I don't see that that's what happened in this case. I understand what Your Honor is saying, I believe. But if we look at the specific language of 3.2C, which is the relevant section here, that section requires several things, some of which are defined terms, some of which are undefined. And Delaware law applies to this contract. This is de novo review. The specific terms that are defined in the contract relate to third party. And perhaps Your Honor's question addresses the question as to whether or not a sales agent is truly a third party with regard to this agreement. Because I believe if we look at the authorized to begin selling language, an agent is clearly authorized, a sales agent clearly begins selling. So to me, that part almost defines itself. If a sales agent isn't authorized to sell, I don't know what they're authorized to do. But the term third party is very specifically defined here. And specifically, if you read the contract, excludes agents. Third party is defined as anybody other than Uran, Inesta, and Impax. Uran, Inesta, and Impax are also in 1.3, 1.11, and 1.17 of this contract specifically defined terms. Inesta is defined as Inesta AG and its affiliates, and it includes Cefalon. Affiliates is also a defined term in this contract under 1.1. Affiliate requires that you have management control or that you own more than 50% of the other party. And with regard to that particular point, there's no dispute that they had management control of Watson. They didn't. There's also no dispute that they own 50% of Watson. They didn't. We also know that the fact that agents was left out. Other parts of this agreement, specifically 2.2 and 2.3 when we get to the releases, talk about Inesta and Impax, again, defined term, and release with regard to Inesta and its agents, Impax and its agents. Agents are not included as third parties in this contract. And with regard to Delaware law applying that, a defined term has to be construed with regard to the contract. Here the contract specifically does not permit an agent to be a non-third party. They are a third party. They are authorized to sell even if only a sales agent. And we would submit clearly they sold authorized generic product. If you look at the Watson agreement, which we don't even think is necessary, 1.20, which talks about a definition of net sales in that agreement, says sold by Watson on behalf of Inesta. 3.2 doesn't say that you have to sell on your own behalf. So our view is... If you thought that you had the right to sell this product that was delivered to you in August of 2011, why didn't you do that? Part of the reason, Your Honor, and we've tried to explain this in the briefing, is we were not ready to go at that point. The time frame is actually compiled here. We were not ready to go even as of November 8th. Paragraph 4 of the settlement agreement has very detailed requirements as to what you have to do prior to any sales or in connection with any sales, including an obligation that you have to fulfill within 30 days of what you believe to be the effective date. Did you fulfill any of those obligations under Paragraph 4? Your Honor, as far as I'm aware, that's not in the record, and I don't know the answer to that. I do know that we had obviously ordered product because we received it. We ordered product well before the injunction. Right, but ordering product doesn't have anything to do with Paragraph 4. Paragraph 4 has to do with within 30 days of the effective date, you have to provide... Your Honor, the record is... There's a lot of obligations, and I don't see anything that indicates that any of those obligations were fulfilled. Your Honor, there's clearly nothing in the record with regard to that. That's correct. What do you see was your benefit that you derived under the settlement agreement? What we saw as the benefit was, one, obviously there's a date certain that's over a decade. That's part of it. And part of it, I think we agree in some senses that the benefit is to go when other generics come on the market. Now the question is, and I think their argument actually goes too far. Taken to its logical extreme, their argument is, it's really a question as to whether... It gives you a head start over the other generic... No, the intent would be, the intent at the time the agreement was signed, when there was nobody on the market, was that at the time other parties went on the market, we would be entitled to do so under the specific provisions under 3.2. Their argument has to equate to the fact that even if they were still selling with Watson now, basically as long as it's a sales agent agreement, we wouldn't be able to come on the market if they were selling with Watson now. I clearly don't think that's what our client or any generic client would have negotiated. The idea was if a generic came on the market, we'd be entitled to do so. There was an at-risk launch here. But wasn't one of the benefits is that you were able to stockpile an inventory? So you were... that gave you a head start over the other... Certainly, the intent was we could place orders, et cetera, and get those. We didn't get them obviously... But you actually did compile or build an inventory. We have some inventory on hand. That was the inventory that was delivered in August of 2011. That's correct, Your Honor. You don't see that as being in concert or with the brand names? I'm not sure I understand the question, Your Honor. I don't see it in concert with the brand names. Your ability to build an inventory and have a head start under the terms of the agreement or the injunction, rather, isn't that activity that's in concert with the joint parties? Your Honor, what I can tell you is we ordered the product prior to the injunction being entered. As I understand it, the product was delivered. I don't believe it impacted anything else at that time. We have the product. The injunction is with regard to commercial sales, et cetera. Before you sit down, let me ask you a question. You keep referring to additive controls, but because this is not a matter of substantive patent law, we are required to apply the law of the regional circuit, and that case was not a Third Circuit case. It did not apply the law of the Third Circuit, did it? As far as I'm aware, Your Honor, that's correct. I don't believe... How about the Fifth Circuit? I would have to refer back to that, Your Honor. I don't recall that, but I think the point that I would make on that is, regardless of what this court does with the injunction, I don't think there's been any dispute from plaintiff appellee's side that at the very minimum, the contract construction issue is before the court because that was the final decision entered in a patent case. All right. Let's hear from... Anything else you need to add? I just have one quick question. I wanted to clarify what I was referring to in the injunction, and that's paragraph number two where it says with respect to cephalon and neuron, other persons who are in active concert or participation with them. And my question is whether impacts ability to build an inventory and the fact that you had a benefit that you gained under the settlement agreement. Aren't you in active concert or participation with them? Again, Your Honor, I think, and this addresses the point about whether additive controls or not, but that's language obviously that comes from the rules themselves. And what that really applies to, as I understand it, is which parties might be in contempt, but it doesn't subject a party that's no longer before the jurisdiction of the court to actually being a party to the injunction itself. Okay. Thank you, Mr. Musgrove. Mr. Singer? Good morning, and may it please the Court. It's nice to be here again. I want to address, Judge Rayner, the question you raised about the settlement agreement and the role that Watson played here. Counsel said if a sales agent isn't authorized to sell, I don't know what they are authorized to do. The way we determine what the scope of an agency is is we look at the agreement between the agent, if you will, and the principal. And it is absolutely clear from the sales agent agreement that Watson could not sell the product. That was the whole point of the sales agent agreement. Watson's authority was to solicit orders on behalf of ANESTA, and there are multiple provisions in the agreement that relate to the issue that Watson was not selling. How do you respond to the opposing counsel's argument that, while clearly that was an attempt to make sure you didn't fall within the word sell in the settlement agreement, the settlement agreement doesn't define sell as any particular term of art. When I think of when I go in and some kid is selling me a cell phone, I think he's selling, even though I know he doesn't personally have the right to sell that product to me. The company is selling it. And the answer to that is under Delaware law, what Delaware law instructs us to do in construing the settlement agreement, the settlement agreement is a contract under Delaware law, that we look to the meaning of that term as a third party would view it under the Delaware statutes and under the Delaware, frankly, the Delaware dictionary definitions. And we've all gone to Black's Law Dictionary and other sources, and we've gone to the UCC as well. And each of those circumstances define a sale as the passing of title from one person to another for a price. And that's why, in essence, what you have in the contract between Watson and Anesta is not that circumstance. This is actually two parts. First, I just want to clarify that counsel's last point that he made, which is that your motion to dismiss as it relates to the injunction was only a partial motion. That is correct. You concede there's jurisdiction over the substantive ruling as it relates to the settlement agreement. Yes, we do. There's a declaratory judgment on the settlement contract, and we agree. I don't agree with what's been stated about the injunction, but I do agree that there is jurisdiction to determine whether or not Judge Robinson construed the contract correctly. Did the trial judge find an ambiguity in the agreement that she then construed consistent with what she thought to be the party's intent, or did she find that it unambiguously included only the transfer of title contracts? It's a little bit unclear. That's what I thought. So that's why I'm asking the question. Yes, so what you see in her ruling, in the court's ruling, is both a resort to describing intent. She talks about the general intent of the parties, but then she also talks about, or the court also talks about, the language of 3.2c, that it does not encompass plaintiff's own actions to sell its own product, whether it be with the assistance of a sales agent or any other intermediary. I mean, that's a typical, as all parties have agreed, sort of a typical way that branded companies would sell their own authorized generic, is to seek assistance and help from another company. It doesn't have to be Watson. It could be McKesson. It could be Walmart. I mean, it's almost that because it's Watson, it becomes some kind of, oh, we're out there with another generic. No, we're using the services of Watson in that particular field to accomplish sales of our own. And Watson was required to tell people that these were URAN sales. They were prohibited from selling the product, as the declarant for URAN said, because they didn't want any competition with their own sales. I mean, every state is different. How does Delaware law treat the issue of intent? Do you get to intent before reaching a conclusion that the language is ambiguous or not ambiguous, like you would in California, for instance, or not? What the Delaware authorities say is that to effectuate the intent of the parties, we look at the objective view of what the language means. If there is an ambiguity, then we go to parole evidence. But you are supposed to, under the Supreme Court authorities, look at the contract, construe the term, in this case sell, according to the objective third-party view. If there's an ambiguity in what that term sell might mean or what the terms authorized or licensed might mean, then we do go to parole. And that's why below we ask for an evidentiary hearing on that point if, in fact, the court found an ambiguity. The resort to intent, as I said, makes it unclear from the district court's opinion whether she found or whether the district court found an ambiguity  We don't believe it is ambiguous. I mean, the parties' definitions of sell, the definitions of sell under Delaware are uniform in terms of the passage of title. And whatever license or authority we had to give to that third party, they had to be able to sell the product. It is just that simple. And that is how URAN structured its arrangements. And let's remember the purpose that Judge Robinson and the district court focused on. And the idea behind 3.2C really is a most favored nation clause. I heard that they sort of agree with that. It wasn't quite clear as to how far our agreement goes. But the idea behind it is to give impact the benefit of some other party's better negotiating skills if, in fact, there were another impacts out there who we sell with or reached an agreement with that got a better entry date. That's the whole point of this is that they got out of the case, as we all got out of the case, they get the benefit of someone's superior negotiating skills who might have had substantially more leverage to extract the concession from plaintiffs. What's the status of PAR right now? PAR is before the district court. They, like Mylan, we have had some discussions with the district court about the injunction, which I think expires soon.  Did you say it expires? Right. Under the panel's prior order, it's 45 days from mandate in the prior decision pending further order of this court or the district court. And the district court is considering what to do with the injunction. So PAR is there and Mylan is there at the district court as well. PAR has not indicated whether they're going to petition for certiorari as Mylan has. Have you conceded that this court has jurisdiction over this case? And here's the thing, Your Honor. We concede that there's jurisdiction over the judgment, the declaratory judgment. We do not concede that there's jurisdiction over the injunction. And that has import, right? If, in fact, if, for example, this court says, you know, this is an ambiguous term, right, we think the district court should reconsider, if you will, what it means to have a more fulsome record in determining what the terms of the contract mean, then, of course, it would be remanded. Or if it's remanded for some fact finding. But that injunction, that preliminary injunction, in our view, the ability to appeal that has been long since passed. That injunction was entered in May as articulated. How do you see the application of additive with respect to the injunction? In that circumstance, I think the – I thought additive stated that the injunction applies to the non-parties in active concert. That's the statement of the law. That – and, you know, those parties who are in active concert, how you can be held in contempt of injunction that you have notice of and not be a party to it is – I don't see that distinction as being a real distinction. And let's be clear. These parties were in active concert. They had – we were their sole supplier for this product. That's how this was going to work. Before we had that May hearing, which was the subject of great controversy. How would you describe the benefit that impacts derived under the settlement agreement? A guaranteed source of supply of a product that they had invested, as we described in their brief, very, very little. I mean, to get an and to approve is not a – it's not a trivial thing. You know, we – it's not nearly the – what we like to describe as the heroic effort of the brand. But it's not nearly the effort of the brand. But it's not a small thing. Regulatory filings cost money. Producing your own product costs money. All that – all the sort of the circumstances that surround that are things that the company has to do and has to devote resources to. They got, out of the settlement, a guaranteed source of supply if the product is going to be sold for generic purposes. They don't have to do anything. They simply relabel the product as impact. That is the extent of it as to what they have to do. With whatever markup they choose to put onto it. That's right, and they get to make money out of it, too. Let me ask you, and I know that there's a limitation with respect to the record, but as to all of these activities under Paragraph 4 of the settlement agreement, did any of those occur? To my knowledge, none of them actually occurred. And that goes to the conduct point we made, which is this dispute,  all I can say is that it arose at an awfully late time. IMPACTS was at the May hearing on injunctions. So this takes us back really to the question of what, in fact, would happen on IMPACTS' theory of the contract interpretation if we resolve this appeal on the issues that they have raised. Do you agree that there are no further obstacles to their immediately entering the market? No, of course the contract is the obstacle to them entering the market. The contract has not been triggered. That is the point, and that is the point of... I think you missed the question. What Judge Newman was asking is assuming we disagree with you on that point. Oh, I understand. Assuming we say the contract is not a bar. If the contract is not a bar... On the issue on which they have asked us to construe it, not necessarily on the issues on which we have not received a response to our questions from IMPACTS. On Paragraph 4, for example. The injunction is still in place, so the injunction is still a bar to your plaintiffs doing anything. The district court entered the injunction as a status quo, injunction to preserve the status quo pending the appeals which are still going forward with Mylan's petition for certiorari. That was the purpose of that injunction. It wasn't an injunction, as Judge Robinson eloquently said at the hearing below. It wasn't an injunction to benefit plaintiffs. It was the court's injunction to preserve the status quo and prevent any party from benefiting from the uncertainty surrounding... But then all IMPACTS would have to do is to sit, I mean, assuming on this assumption that you're wrong with respect to the agreement and how it works, all IMPACTS would have to do is to sit and await the expiration of that injunction, which you said is going to happen soon. Well, I think that's correct. If, in fact, the contract is not a barrier for them to launch, then the injunction is the only thing stopping them from launching. But as I heard it said, we agree that somehow there's no barrier. We don't agree, of course. The contract should be interpreted according to its terms. Watson required to have the authority to sell the product, a license to sell, and Watson clearly did not have that license or authority. Had the court entered a permanent injunction against Mylan? Against Mylan, no. There's no permanent injunction. The preliminary injunction is still under consideration at the district court. The district court is awaiting the parties to respond back to the district court before the deadline for the injunction to expire. I assume there's a request for a permanent injunction against Mylan, though. Actually, what the parties have agreed, and we've agreed with IMPACTS as well, is to extend the preliminary injunction pending the further determination of these matters on appeal. It's just a matter of actually putting that agreement on pieces of paper. We've exchanged with Mylan, PAR, and IMPACTS drafts of extensions of the court's preliminary injunction from 2011 pending further appeals and consideration of the issues both at the Supreme Court and at this court on the IMPACTS appeal. I just wanted to, just one last point, and that goes to conduct. And again, at the May hearing, IMPACTS was there. According to them, their right to be on the market had been triggered at the time of the May hearing on injunction. They said not a word. It wasn't a circumstance of a non-party not being there. They were there. They appeared and listened and sat at council table for that hearing. They then got product at some point in the summer, probably in the interim, when, if the court will recall, the injunction was entered, then it was stayed until there was a period of time when my clients were not in the court. Why was IMPACTS not specifically named in the injunction if they were present? Pardon me? Why was IMPACTS not specifically named in the injunction? I think that was just an oversight, Your Honor, but it also goes to the extent that there needed to be a specific naming. But it more goes to the fact that plaintiffs were enjoined with anyone with which they were in active concert with. But you don't dispute that at that hearing, Mylan's counsel actually made a comment that IMPACTS wouldn't be covered by it. If Mylan's counsel said that, I would certainly not dispute that, Your Honor. I don't know that. I don't remember that from the record. But, of course, if someone said something, I would not dispute that Mylan certainly is the one that made the clarification. We, of course, argued at that hearing that IMPACTS had no right to be on the market in response to Mylan's comments. And so, really, at the end of the day, the construction of the contract is consistent under Delaware law with what my clients did with Watson, and IMPACTS' conduct over the course of seven months shows that the parties were at a mutual understanding. I don't know why the issue arose, but in my experience, any company that can make $8 million a month, which is what they said they could have made from August through November, any company that could do that would, and would comply with the provisions that Your Honor called out in the contract to make that $8 million a month. That's $25 million that they could have made, according to them. And there was, according to them, they weren't enjoined, and they had a right to launch under the contract. Counsel has said they weren't ready. There's nothing in the record. They had every opportunity to come to the district court and put those kinds of things in the record. No record was made on that at all. So when the injunction was, I'm going to say modified, in November of 2011, and IMPACTS was now specifically named, were they named to add them to the injunction, or was that to clarify that they were included ab initio? It was a clarification, and if the court will recall, Mylan raised the issue, and Mylan asked for that clarification, and plaintiffs did not object, and IMPACTS did not attend the hearing. If there's any other questions, I have nothing further. Any more questions? Thank you, Your Honors. Okay, Mr. Musgrove, you've exhausted your time, but let's restore the rebuttal time so we hear all the issues. Thank you, Your Honor. I'll be very brief, if I may. There was a comment made that Watson would be the same as Walmart or other parties under this agreement. That's a position that's never been taken, but I would say that that's completely inconsistent with the agreement. If you look at the definition of authorized generic, which is what we're talking about being sold under 3.2c, it talks about being sold into the retail chain of trade. So what we're talking about is somebody like a Watson selling into that chain. So the fact that a distributor or a wholesaler in the retail chain of trade is not equivalent to Watson in this agreement, I don't believe that's been reflected in this record. With regard to the intent, a question Judge O'Malley asked, one point I would like to make there, Your Honor, is if you look at the Delaware cases, Laurel Arden and Rome Pallant that have been cited specifically, what you're looking at is you're not actually looking at the specific intent of the parties. The courts don't care about that. What they ask is actually a hypothetical. What would a reasonable person have thought in this instance? And here we would go back to what impacts was bargaining for, to answer Your Honor's point, Judge Reyna. What impacts was bargaining for was the right to be on the market when other generics were on the market. They weren't permitted to do that during the at-risk launch period. They didn't have product. But there's also no question that 3.2c is a permanent trigger. 3.2c had nothing to do with an at-risk launch. It doesn't have that requirement to pull back. So if 3.2c is triggered, we have the right to go now. And their position would be, even if they were still on the market with Watson today, impacts bargained away the right to be on the market with another generic because they're a sales agency agreement. I think no reasonable person in a generics position would bargain away that right, especially given that it was known that they had the infrastructure to go themselves. I think absent further questions from the Court, I thank you for your time. Thank you. Thank you. So your case is taken under submission. That concludes the arguments for this morning. All rise. The Honorable Court is adjourned from day today. Have a nice trip back. I will. Thank you.